# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

CAROL SEWELL,

        Plaintiff,

    vs.

CAPITAL ONE FINANCIAL
CORPORATION, et al.,

        Defendants.

3:18-cv-00016-RCJ-CBC

**ORDER**

       This case arises from the death of Karen Todd, who drowned while trying to navigate an inflatable two-person canoe during a guided tour in the Arctic National Wildlife Refuge. The Plaintiff filed this suit to recover benefits under a life insurance policy, and now pending before the Court are competing motions for summary judgment. Because Ms. Todd was not a passenger in a common carrier and no material facts are in dispute, the Court grants the Defendant's Motion for Summary Judgment (ECF No. 27).

## I.    FACTS AND PROCEDURAL HISTORY

       The facts material to this dispute are uncontested; the Parties simply disagree on whether those facts support a finding of coverage under the policy. Federal Insurance Company ("the Defendant") issued a blanket accident insurance policy ("the Policy") to Capital One Financial Corporation during the period in question. Under the Policy, the "persons insured" include Visa Signature cardholders, and their "spouse and dependent children." (Def.'s Mot. Summ. J. 3:1–17,

Ex. 1, ECF No. 27.) The coverage provision of the Policy provides in relevant part that the Defendant "will pay the applicable Benefit Amount if an Accident results in a Loss not otherwise excluded. The Accident must result from a covered Hazard and occur during the policy period." (Pl.'s Mot. Summ. J. 2:21–23, Ex. 1, ECF No. 28.)

The Plaintiff's domestic partner, Ms. Todd, used her Capital One card to purchase from Alaska Alpine Adventures a twelve-day rafting and hiking adventure on the Kongakut River in the Arctic National Wildlife Refuge (the "Kongakut Adventure"). (Def.'s Mot. 5:26–28.) While on the trip, Ms. Todd and the other participants used two-person inflatable rafts (alternately referred to as canoes), to travel down the river. The rafts were operated and piloted by Alpine Adventures' guests. Each guest was responsible for steering his or her raft and had a paddle for propulsion and control. Alpine Adventures' employees did not have any physical control over the operation of the rafts on the river, and the rafts were not licensed or required to be by law. (*Id.* 7:6–15.)

On the eighth day of the trip, Ms. Todd and a fellow participant, Cheryl Minnehan, were traveling together in one of the two-person inflatable rafts. The participants on the Kongakut Adventure were preparing to eddy out before entering a section of class three whitewater in the river. According to Dan Oberlatz, the owner and founder of Alpine Adventures, class three water includes standing waves and obstacles that can knock over a boat. Regrettably, Ms. Todd and Ms. Minnehan were unable to eddy out successfully and fell into the river. Attempts to rescue them were unsuccessful, and they were pulled downstream and drowned. (*Id.* 7:16–8:6, Ex. 4.)

After the Plaintiff's claim for life insurance under the Policy was denied by the Defendant, the Plaintiff filed this action for breach of contract, bad faith, breach of the Nevada Unfair Claims Settlement Practices Act, and punitive damages for malice, fraud, or oppression. Now before the Court are competing motions for summary judgment.

///

## II.   LEGAL STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court uses a burden-shifting scheme. The moving party must first satisfy its initial burden. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir.1992)). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Catrett*, 477 U.S. at 323–24.

If the moving party fails to meet its initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50. Notably, facts are only viewed in the light most favorable to the non-moving party where there is a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). That is, even where the underlying claim contains a reasonableness test, where a party's evidence is so clearly contradicted by the record as a whole that no reasonable jury could believe it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

## I. DISCUSSION

The Defendant argues that it is entitled to summary judgment, because Ms. Todd was not riding as a passenger in a common carrier when the accident occurred. The Court agrees.

### A. Defining Common Carrier

The policy offered by the Defendant contains the following coverage:

We will pay the applicable Benefit Amount if an Accident results in a Loss not otherwise excluded. The Accident must result from a covered Hazard and occur within the policy period. The Loss must occur within one (1) year of the Accident.

(Pl.'s Mot. 2:21–23.) Thus, for coverage to exist: (1) a covered hazard must occur; (2) that results in an accident; (3) that causes a loss that is not excluded; and (4) that loss occurs within one year of the accident. The policy further defines the term hazard. It reads, in relevant part:

> Financial Services Common Carrier Hazard means the circumstances, subject to the terms and conditions of the policy arising from and occurring on a Covered Trip while the Insured Person is:

> 1). riding as a passenger in or entering or exiting any Common Carrier

(*Id.* 3:2–5.) Consequently, Ms. Todd (the insured) must have been a passenger in a common carrier in order for a hazard to have occurred under the policy that resulted in an accident that caused an unexcluded loss. Common carrier is defined in the policy as "any licensed land, water or air conveyance operated by those whose occupation or business is the transportation of persons or things without discrimination and for hire." (*Id.* 3:15–16.)

The Parties agree that "Ms. Todd's death resulted from an 'Accident' and that the 'Loss' occurred within a year of that 'Accident.'" (Def.'s Mot. 9:17–18.) The Parties disagree whether the facts establish that Ms. Todd was a passenger in a common carrier establishing that the accident resulted from a covered hazard. The Plaintiff strenuously argues that common carrier should be defined at the level of the company that provided the guided tour and not at the level of the individual canoe, given commonly accepted definitions of common carrier. The Defendant argues in response that regardless of commonly accepted definitions, the policy contains its own definition of common carrier and that definition does not define common carrier at the company level.

The Court agrees with the Defendant. The Plaintiff cannot substitute Mr. Garner's definition of common carrier found in Black's Law Dictionary for the definition in the policy defining coverage. Therefore, the Court need not analyze other definitions of common carrier that are inconsistent with the language defining common carrier in the policy. The pertinent question

here is whether the language of the policy lends itself to the Plaintiff's view that common carrier should be defined at the company level.

Under the policy, a covered hazard must occur while an insured person is riding as a passenger "*in* . . . any common carrier," which is "any licensed land, water or air conveyance operated by those whose occupation or business is the transportation of persons or things without discrimination and for hire." (Pl.'s Mot. 3:2–16 (emphasis added).) As a matter of textual interpretation, the Plaintiff's argument fails to make sense of this language. It is difficult to analyze common carrier at the level of the operator when the policy states that the "insured person [must ride] as a passenger *in* . . . [a] Common Carrier" for a covered hazard to occur. (*Id.* 3:2–5 (emphasis added).) This language becomes nonsensible when interpreted at the level of the company. Persons do not ride in companies, they ride in *things* operated by companies.

The definition of common carrier is also at odds with the Plaintiff's proposed construction. Defining common carrier as the company or operator is incongruous with the language that refers to a common carrier as a type of conveyance that is operated by a company with particular characteristics. The first portion of the definition refers to a conveyance—something that persons can ride in—as a common carrier, while the second part lists requirements of the operator in order for the conveyance to qualify as a common carrier. The Plaintiff's proposal reverses the language and requires the Court to construe the definition of a common carrier as a type of company that provides conveyances. But the policy does not require an insured person to be on a conveyance operated by a common carrier. It defines a common carrier as a conveyance, a thing, operated by specific persons. Thus, the language of the policy does not support the view that a common carrier should be defined at the company level. Regardless of the purported reasonableness of the definition, the Court is unwilling to rewrite the plain language of the private policy.

*///*

Accordingly, no coverage exists under the policy unless: (1) Ms. Todd was riding as a passenger; (2) in a licensed water conveyance; and (3) the water conveyance (canoe) was operated by someone whose occupation or business is the transportation of persons or things without discrimination and for hire.

It is undisputed here that the canoe that Ms. Todd was in before she drowned was not licensed. The Plaintiff strenuously contests, however, whether the canoe had to be licensed based on a policy definition found in a brochure. But regardless of that dispute, the Plaintiff has not established that Ms. Todd was a passenger in a common carrier. Even adopting the Plaintiff's construction of common carrier, the Plaintiff must still demonstrate that: (i) Alpine Adventures is in the business of transportation and (ii) operates for hire without discrimination. The Plaintiff has failed to meet either requirement.

**B. Alpine Adventures' Occupation & Degree of Control**

Alpine Adventures is not in the business of transportation and lacks the traditional degree of control over its patrons that has historically justified common carrier status. Therefore, under the commonly accepted definition of common carrier offered by the Plaintiff[1] (and under the language of the policy), Alpine Adventures is not a common carrier.

*1. Factual Evidence*

The facts do not support the contention that Alpine Adventures' occupation is transportation. Alpine Adventures' Release of Liability & Acknowledgment of Risk Form ("Release of Liability Form") states that:

///

---

[1] "Any carrier required by law to convey passengers or freight without refusal if the approved fare or charge is paid in contrast to private or contract carrier. One who holds himself out to the public as engaged in business of transportation of person or property from place to place for compensation, and who offer services to the public generally." *Black's Law Dictionary* 275 (6th ed. 1990).

AAA [Alaska Alpine Adventures] does not own or operate any entity that provides transportation or lodging services, for example air taxis, inns, lodges, and hotels/motels. As a result, AAA does not retain control over these entities and is not liable for any acts, negligent or willful, or failure to act of any such person, entity or third party.

(Def.'s Mot. Ex. 5.) Ms. Todd read and signed Alpine Adventures' Release of Liability Form, and it directly expresses that Alpine Adventures is not a transportation company. (*Id.* Ex. 3.) The two licenses held by Alpine Adventures confirm as much. Alpine Adventures holds a business license, issued by the Alaska Department of Commerce, Community, and Economic Development, in which it self-identifies its line of business as "Arts, Entertainment, and Recreation" because that category "most closely aligned" with Alpine Adventures' business. (Pl.'s Mot. Exs. 1D, 1E.) Alpine Adventures also holds a Special Use Permit issued by the U.S. Fish and Wildlife Service that authorizes it to conduct business in the Arctic National Wildlife Refuge, and it identifies the permitted activity as "commercial recreational guiding." (*Id.* Ex. 1D.) Likewise, when the founder and owner described the company in his deposition, he explained that "Alaska Alpine Adventures is an adventure travel company" that provides recreational guide services, including "backpacking, river rafting, kayaking, [and] base camp hiking trips" that "focus on Alaska's national parks and wildlife refuges." (*Id.* Ex. 1E.)

Unlike companies that provide transportation for hire without discrimination, Alpine Adventures is not in the business of providing safe and secure transportation like a common carrier. To the contrary, Alpine Adventures repeatedly informs its guest of the many substantial risks associated with participating in its wilderness adventures. As the Supreme Court of Georgia and Utah have pointed out: "The heightened standard of care required of common carriers is predicated on the principle that '[p]ersons using ordinary transportation devices, such as elevators and buses, normally expect to be carried safely, securely, and without incident to their destination.'" *Lamb v. B & B Amusements Corp.*, 869 P.2d 926, 930 (Utah 1993) (quoting *Harlan v. Six Flags Over*

*Georgia, Inc.*, 297 S.E.2d 468, 469 (1982)). Persons who participate in whitewater rafting and adventure trips, however, have different expectations. They expect entertainment in various forms. Wilderness adventures, like whitewater rafting, "are not designed to provide comfortable, uneventful transportation, even when the equipment operates without incident and as intended." *Lamb*, 869 P.2d at 930–31.

In addition, although Ms. Todd and other guests are physically transported and travel during excursions with Alaska Alpine Adventures, the purpose of a guided wilderness tour is recreation, not transportation. As Alpine Adventures' owner commented: "The people that travel with us want to see Alaska in a way that is physically challenging and takes them to places that are off the beaten path, and, you know, want to experience Alaska, in what I believe is its best terms." (Pl.'s Mot. Ex. 1E.)

The Plaintiff herself affirmed that Alpine Adventures' occupation is not transportation. She explained in her deposition testimony the recreational nature and purpose of the trip:

> Q: "Todd and a group of her friends wanted an adventure and signed up to go rafting with two tour guides from Alaska Alpine Adventures, Sewell said." Is that something that you said in one of the interviews you gave?
>
> A: I did. I didn't say it like that. They write it up a little differently than what I said. But generally, yes.
>
> Q: Okay. In what way did your statement differ from what they said?
>
> A: Well, I know I didn't say it like this, but I, you know, I told them that, that Karen loved to go on adventure trips.

(Def.'s Mot. Ex. 3.) The Plaintiff further explained that this trip was the "most adventuresome" of Ms. Todd's adventure trips, because it was the most challenging trip that she had been on. (*Id.*) The Plaintiff herself did not join Ms. Todd, because she testified that she did not "do hiking" or kayaking trips because that was not her "interest." (*Id.*) However, if the purpose of the Kongakut Adventure was really transportation, a lack of interest in hiking or kayaking (as opposed to a lack

of interest in traveling to Alaska) would not be relevant to a decision whether to accompany Ms. Todd. Thus, the facts do not support the contention that Alpine Adventures is in the transportation business.

### 2. *Legal Precedent*

Caselaw does not support the contention that Alpine Adventures' occupation is transportation or that Alpine Adventures exercises the degree of control commensurate with common carrier status and liability.

#### a. *Whitewater Rafting Operators*

Courts across the country, including two United States circuit courts, have held in remarkably similar circumstances that whitewater rafting operators are not common carriers, because whitewater rafting companies are not in the business of transportation. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. McMurray*, 342 F. App'x 956, 959 (5th Cir. 2009) (interpreting a nearly identical insurance policy and holding that a whitewater rafting operator was not a common carrier, because "[t]ransportation is incidental to the primary purpose of entertaining rafting participants"); *Deutsch v. Fed. Ins. Co.*, 85 F.3d 640 (10th Cir. 1996) (holding that a whitewater raft did not qualify as a common carrier, because riders took the rafting trips as a recreational experience rather than as a means of transportation); *Spath v. Fed. Ins. Co.*, 101 F. Supp. 2d 49, 50 (D. Mass. 2000) (holding that a whitewater rafting operator was not a common carrier under an insurance policy that provided coverage for hazards while riding as a passenger in any conveyance operated by a licensed common carrier, because transportation was incidental to the recreational nature of whitewater rafting); *Spath v. Dillon Enterprises, Inc.*, 97 F. Supp. 2d 1215, 1218 (D. Mont. 1999) (holding that a whitewater rafting operator was not a common carrier because it only transported persons on rafting trips under special agreement rather than transporting persons indiscriminately for hire like a common carrier); *Barker v. Goldberg*, No. CV-86-3039, 1987 WL

10820, at *4 (E.D.N.Y. Apr. 29, 1987) (analyzing the definition of common carrier under Black's Law Dictionary and determining that a whitewater rafting company was not a common carrier, because transportation is incidental to the purpose of whitewater rafting, which is "to recreate in the outdoors—that is, to enjoy the thrill and excitement of paddling through rapidly moving spots on the river"); *Beavers v. Fed. Ins. Co.*, 437 S.E.2d 881, 884 (N.C. Ct. App. 1994) (holding that a whitewater rafting operator was not a common carrier under an insurance policy that provided coverage for hazards while riding as a passenger in any conveyance operated by a licensed common carrier because transportation was incidental to the primary purpose of whitewater rafting—"to provide participants with outdoor adventure, camaraderie, excitement and thrills").

The Fifth Circuit, for example, in *National Union Fire Insurance Co. of Pittsburgh, Pa. v. McMurray*, 342 F. App'x 956 (5th Cir. 2009), upheld summary judgment for an insurance company that denied coverage in similar circumstances. There, the plaintiff's husband, Joe McMurray, died during a whitewater rafting trip while on vacation in Costa Rica. The McMurrays purchased a rafting excursion from Rios Tropicales using a credit card that provided coverage for accidental death or dismemberment "while riding as a Passenger in or on (including getting in or out of, or on or off of) any Common Carrier." *McMurray*, 342 F. App'x at 959. During the rafting trip, Joe was tragically thrown from the raft and drowned.

On summary judgment, the district court found in favor of the insurance company, National Union, because it determined that a whitewater rafting company like Rios Tropicales was not a common carrier, which that policy also defined as "any licensed land, water, or air conveyance operated by those whose occupation or business is the transportation of persons for hire." *Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. McMurray*, No. 4:06-CV-545-Y, 2008 WL 11422710, at *3 (N.D. Tex. Sept. 29, 2008). The court concluded that the whitewater rafting company was not a common carrier, because "[a]lthough Ríos Tropicales transports its passengers along a river,

the transportation is merely incidental to the primary purpose of the rafting trip—entertainment."

*Id.* On appeal, the Fifth Circuit upheld the district court's decision and subsequently held that:

> the plain or ordinary meaning of "occupation or business" encompasses a primary purpose requirement. An entity's occupation or business is transportation for hire only if transportation is the primary function of the entity in question. Transportation is incidental to the primary purpose of entertaining rafting participants. Accordingly, Rios Tropicales is not a common carrier under the policy, and the district court properly granted summary judgment in favor of National Union.

*McMurray*, 342 Fed. Appx. at 959.

The Court of Appeals for the Tenth Circuit reached a similar conclusion in *Deutsch v. Federal Insurance Co.*, 85 F.3d 640 (10th Cir. 1996). There, the district court held that a whitewater raft did not qualify as a common carrier, because the riders took the rafting trips as a recreational experience rather than as a means of transportation, and because the rafting company did not indiscriminately provide trips to everyone who wanted to ride. *Deutsch*, 85 F.3d at 640. In its analysis, the court determined that "[t]he basic function of a common carrier is the provision of safe and secure transportation of persons or property" and the rafting company did not meet that definition. It reasoned that the Plaintiff and her husband "did not go on a raft trip merely to be transported from one point to another." *Id.* Instead, they "went on [a] whitewater rafting trip for the thrill, adventure, fun, and excitement of this recreational experience." *Id.* Therefore, although "a white-water raft may convey persons from one place to another, . . . it is not a 'common carrier,'" because "the 'carriage' by raft and water is 'merely incidental' to the purpose of the trip." The Tenth Circuit affirmed the district court's decision "for substantially the same reasons." *Id.*

Unlike whitewater rafting companies, ski lift operators have been found to be common carriers using the same framework analyzing the purpose of carriage. In contrast to the typical recreational purpose of whitewater rafting, a New York state court determined that the purpose of a ski lift "was to be taken to the top of [a] mountain and not primarily to be amused or thrilled in

the ascent thereto." *Grauer v. State*, 181 N.Y.S.2d 994, 999 (Ct. Cl. 1959), *aff'd*, 192 N.Y.S.2d 647 (1959). Accordingly, because the court determined that the primary purpose for the ski lift was transportation, it held that the ski lift qualified as a common carrier.

### b. Amusement Rides Operators

Applying the same framework in the related context of amusement ride operators, "the majority of courts" have determined that ride operators are subject to the normal duty of reasonable care under the circumstances and are not common carriers, because the purpose of carriage on an amusement ride is recreation rather than transportation. *Lamb v. B & B Amusements Corp.*, 869 P.2d 926, 930–31 (Utah 1993) (holding that amusement rides are not common carriers, because they are not "designed to provide comfortable, uneventful transportation" like a common carrier). *See U. S. Fid. & Guar. Co. v. Brian*, 337 F.2d 881, 883 (5th Cir. 1964) (stating that the operator of an amusement ride is not a common carrier in Louisiana and is only subject to the duty of reasonable care under the circumstances, although the dangerous circumstances of a ride may necessitate a level of care commensurate with a common carrier); *Firszt v. Capitol Park Realty Co.*, 120 A. 300, 303 (Conn. 1923) (holding that "the occasion of use" of an instrumentality governed whether it was a common carrier, and thereby an amusement park operator of an "aeroplane swing" was not a common carrier, because its use was for pleasure and entertainment); *Sergermeister v. Recreation Corp. of Am.*, 314 So. 2d 626, 632 (Fla. Dist. Ct. App. 1975) (holding that an amusement device, a ride named "Lover's Coach," was not a common carrier, because its use was for entertainment and voluntary, unlike ordinary means of public transportation that are practically compelled and require passengers to place themselves in the care of another); *Harlan v. Six Flags Over Georgia, Inc.*, 297 S.E.2d 468, 469 (1982) (holding that an amusement device called "The Wheelie" was not a public conveyance rendering Six Flags a common carrier, because it was not an instrument of transportation used by people to travel from one place to another, it

was not intended to carry passengers safely and securely to a destination without incident, and because the carriage was incidental to the primary purpose—entertainment); *Brennan v. Ocean View Amusement Co.*, 194 N.E. 911, 912 (Mass. 1935) (holding that the operator of a roller coaster was not a common carrier, because the defendant "did not perform a public service in transporting passengers from one point to another. It merely furnished entertainment on its own premises."); *Chavez v. Cedar Fair, LP*, 450 S.W.3d 291, 299 (Mo. 2014) (en banc) ("[A common carrier does not] encompass an amusement park that operates attractions for the purpose of providing amusement to patrons . . . . [An amusement park] is not in the transportation business, even though its mode of amusement is mobile."); *Bregel v. Busch Entm't Corp.*, 444 S.E.2d 718, 719 (Va. 1994) (analyzing the definition of common carrier under Black's Law Dictionary and holding that an amusement park "is not a common carrier because it does not, as a regular business, undertake for hire to transport persons from place to place. Rather [it] operates . . . for entertainment purposes, and the transportation function is incidental to the entertainment function.").

Although some state courts have determined that operators of amusement park rides are subject to a higher standard of care consistent with a common carrier under tort law, those courts have not determined that amusement rides or operators are common carriers. They have merely determined that reasonable care under the circumstances requires a higher degree of care because of the dangerous circumstances of rides like roller coasters. *See Best Park & Amusement Co. v. Rollins*, 68 So. 417, 417 (Ala. 1915) (holding that roller coaster operators are subject to the same degree of responsibility as common carriers because of the circumstances involved, but stating that "[i]t may be a question of grave doubt whether the operation of a 'scenic railway' in an amusement park, . . . can be properly designated as a common carrier of passengers."); *Lewis v. Buckskin Joe's, Inc.*, 396 P.2d 933, 939 (Colo. 1964) (holding that operators of a stage coach ride were subject to the same standard of care as a common carrier, because "the plaintiffs had surrendered themselves

to the care and custody of the defendants; they had given up their freedom of movement and actions; there was nothing they could do to cause or prevent the accident. Under the circumstances of this case, the defendants had exclusive possession and control of the facilities used in the conduct of their business and they should be held to the highest degree of care."); *O'Callaghan v. Dellwood Park Co.*, 89 N.E. 1005, 1007 (Ill. 1909) (holding that a roller coaster operator is subject to the same standard of care as a common carrier, but not clearly holding that a roller coaster is a common carrier); *Bibeau v. Fred W. Pearce Corp.*, 217 N.W. 374, 376 (Minn. 1928) (holding that the operator of a roller coaster is subject to the same degree of care as a common carrier due to the degree of danger involved, not because a roller coaster is a common carrier); *Sand Springs Park v. Schrader*, 198 P. 983, 988 (Okla. 1921) (holding that roller coasters are subject to a level of care commensurate with a common carrier but disavowing "any analogy between [roller coasters and common carriers]" as the court "doubt[ed] the practicability and necessity of drawing such an analogy"); *Lyons v. Wagers*, 404 S.W.2d 270, 274 (Tenn. 1966) (following *Tennessee State Fair Ass'n v. Hartman*, 183 S.W. 735 ( Tenn.1916)); *Tennessee State Fair*, 183 S.W. at 736 (holding that the operator of an amusement ride owes passengers the same degree of care as a common carrier, but explaining: "We are not to be understood as saying that the operator was a technical common carrier, or that all of the rules governing such a carrier are applicable to him. We are treating only of the measure of care to be observed by him.").

### c. *California Caselaw Regarding Common Carriers*

The Plaintiff cites five cases in support of her argument that a whitewater rafting company is a common carrier. *Neubauer v. Disneyland*, 875 F. Supp. 672, 673 (C.D. Cal. 1995) (holding that the operator of the Pirates of the Caribbean amusement ride at Disneyland was a common carrier); *Gomez v. Superior Court*, 113 P.3d 41, 51 (Cal. 2005) (holding that the operator of the Indiana Jones ride at Disneyland qualified as a common carrier); *Smith v. O'Donnell*, 12 P.2d 933,

935 (Cal. 1932) (holding that an airplane pilot who offered sightseeing flights to the ocean and back was a common carrier); *Squaw Valley Ski Corp. v. Superior Court*, 3 Cal. Rptr. 2d 897, 900 (Cal. Ct. App. 1992) (holding that a ski lift operator was a common carrier); *McIntyre v. Smoke Tree Ranch Stables*, 23 Cal. Rptr. 339, 339 (Cal. Ct. App. 1962) (holding that the operator of a mule train that conducted guided tours over a scenic route was a common carrier).

But contrary to the implication that "numerous courts around the nation" agree with the Plaintiff's argument, the five cases cited are all from California, and they turn on the application of a unique California statutory scheme governing common carrier liability and not the language of a similar policy. As another federal district court held, *Neubauer v. Disneyland*, 875 F. Supp. 672 (C.D. Cal. 1995), one of the cases cited by the Plaintiff, "based its holding on the broad nature of the California statute which defines a common carrier" and is therefore inapplicable in determining common carrier status outside of California under a different definition of common carrier. *Spath*, 101 F. Supp. 2d at 52. Under California law, "Everyone who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry." Cal. Civ. Code § 2168. However, both the commonly accepted definition of common carrier, which the Plaintiff strenuously contends that this Court should use, and the definition of common carrier found in the insurance policy differ from the California statutory definition. Accordingly, the cases that the Plaintiff relies on do not support the argument that Alpine Adventures is a common carrier.

In *Neubauer*, for example, a federal district court in California determined that an amusement park ride was a common carrier under California law. 875 F. Supp. at 673. The court concurred that "[a] reasonable argument [could] be made that common carrier status should not apply to an amusement park ride because it is not the traditional kind of 'transportation' historically contemplated by the common carrier theory, with the main purpose being entertainment rather

than travel." *Id.* However, it concluded by stating: "the California statutory common carrier definition is very broad. Any narrowing of that definition must be for the legislature and not the court." *Id.*

*Gomez v. Superior Court*, 113 P.3d 41 (Cal. 2005), is the most comprehensive California case that this Court has found analyzing whether the operator of a recreational ride can be considered a common carrier. In *Gomez*, the Supreme Court of California determined that the operator of the Indiana Jones ride at Disneyland constituted a common carrier under the California Civil Code. The court noted that the California legislature defined common carrier "in expansive terms," and it agreed with the appeals court that Disney acted as a common carrier, because it "offer[ed] to the public to carry persons." *Gomez*, 113 P.3d at 43–44; Cal. Civ. Code § 2168 ("Everyone who offers to the public to carry persons . . . is a common carrier"). After extensively analyzing cases around the country, the court rejected the approach that the purpose of transportation is relevant in determining whether an entity is a common carrier. The court instead adhered to the view that it previously adopted in *Smith v. O'Donnell*, 12 P.2d 933 (Cal. 1932), that the subjective purpose for which a passenger purchases a ride is irrelevant to the degree of responsibility of the ride operator. *Gomez*, 113 P.3d at 45. It reasoned:

> A passenger's purpose in purchasing transportation, whether it be to get from one place to another or to travel simply for pleasure or sightseeing, does not determine whether the provider of the transportation is a carrier for reward. The passenger's purpose does not affect the duty of the carrier to exercise the highest degree of care for the safety of the passenger.

> Certainly there is no justification for imposing a lesser duty of care on the operators of roller coasters simply because the primary purpose of the transportation provided is entertainment. . . . "[A]musement rides have inherent dangers owing to speed or mechanical complexities. They are operated for profit and are held out to the public to be safe. They are operated in the expectation that thousands of patrons, many of them children, will occupy their seats." Riders of roller coasters and other "thrill" rides seek the illusion of danger while being assured of their actual safety. The rider expects to be surprised and perhaps even frightened, but not hurt. The rule that carriers of passengers are held to the highest degree of care is based on the recognition that "[t]o his diligence and fidelity are intrusted the lives and safety of

large numbers of human beings." This applies equally to the rider of a roller coaster as it does to the rider of a bus, airplane, or train.

///

*Id.* at 48 (citations omitted). Regardless of the primary purpose of a ride, the court stated a roller coaster is still a means of transportation, because it is designed to "transport people along a fixed route." *Id.* at 50. Like a helicopter sightseeing ride, a roller coaster is not a means of transportation merely because it begins and ends at the same place and transports persons in an exciting and fun manner. *Id.* Therefore, after considering the statutory language and caselaw, the court concluded "that the operator of a roller coaster or similar amusement park ride can be a carrier of persons for reward under sections 2100 and 2101 [of the California Code]." *Id.* at 51.

### d. *Legal Relevance of Purpose*

Outside of California, the reasoning and analysis in *Gomez* is unpersuasive. The Court agrees with *Gomez* that the subjective reason a passenger purchases a ticket is irrelevant in determining whether an entity is a common carrier. A bus or plane is not rendered a common carrier because of the subjective intentions of each passenger. Similarly, a passenger cannot cause something that is not a common carrier to become one based on his or her subjective expectations. But *Gomez* is wrong that purpose is irrelevant. Under commonly accepted definitions of common carrier, as the Plaintiff points out, a common carrier is a person "who holds himself out to the public as engaged in business of transportation." (Pl.'s Mot. 6:4–7 (quoting *Black's Law Dictionary* 275 (6th ed. 1990).) To that end, the purpose of a ride is paramount in determining whether an operator is engaged in the business of transportation. Because *Gomez* applied a remarkably broad California statute defining common carrier as "[e]veryone who offers to the public to carry persons," it was not forced to address whether Disney was in the business of transportation. It would be error for this Court to take that approach here under a different definition of common carrier.

### e. Degree of Control Commensurate with a Common Carrier

Moreover, *Gomez*, and the other cases cited by the Plaintiff, can be further distinguished, because in each case the injured person had ceded control for his or her safety over to the operator of the mode of carriage. Traditionally, a reason for the existence and application of common carrier status is that passengers, as an example on planes, trains, and busses, have little control and rely on an operator in nearly complete control of their safety. As the California Supreme Court explained in *Treadwell v. Whittier*, 22 P. 266 (Cal. 1889), the operators of a commercial elevator were found to be common carriers, because elevator passengers entirely depended on the operators for their safe transportation:

> Persons who are lifted by elevators are subjected to great risks to life and limb. They are hoisted vertically, and are unable, in case of the breaking of the machinery, to help themselves. The person running such elevator must be held to undertake to raise such persons safely, as far as human care and foresight will go. . . . Such responsibility attaches to all persons engaged in employments where human beings submit their bodies to their control, by which their lives or limbs are put at hazard, or where such employment is attended with danger to life or limb. The utmost care and diligence must be used by persons engaged in such employments, to avoid injury to those they carry.

*Treadwell*, 22 P. at 271. Similarly, in *Lewis v. Buckskin Joe's, Inc.*, 396 P.2d 933, 939 (Colo. 1964), the Colorado Supreme Court determined that the operators of a stage coach ride were subject to the same standard of care as a common carrier, because "the plaintiffs had surrendered themselves to the care and custody of the defendants; they had given up their freedom of movement and actions; [and] there was nothing they could do to cause or prevent the accident." Therefore, since "the defendants had exclusive possession and control of the facilities used in the conduct of their business" the court determined that they should be subject to the highest degree of care. *Lewis*, 396 P.2d at 939.

That is not the case for whitewater rafting. In the present case, Alpine Adventures had no control over the individual canoes that were controlled and piloted by Alpine Adventures'

customers. Unlike a roller coaster or amusement park ride, whitewater rafters generally do not depend on someone else who is in a superior position of control for their safety. Whitewater rafting outfitters cannot control their environment: they cannot control the water, weather, terrain, or other situational obstacles. Perhaps even less, rafting outfitters cannot control the volition of their customers, especially while in turbulent water. Although rafting outfitters can control when and where to offer rafting excursions and can provide instruction and support, their degree of control in relation to their customers pales in comparison to the degree of control traditionally possessed by common carriers over their passengers.

The California Supreme Court further highlighted the importance of control as a determinative factor in resolving common carrier status in *Nalwa v. Cedar Fair, L.P.*, 290 P.3d 1158 (Cal. 2012). There, despite the broad definition of common carrier in California, the court determined that the operator of a bumper car ride at an amusement park was not a common carrier, because riders did not cede control of their safety to the bumper car operator. Rather, the court explained:

> Riders on [a bumper car ride], are not passively carried or transported from one place to another. They actively engage in a game, trying to bump others or avoid being bumped themselves. The rationale for holding the operator of a roller coaster to the duties of a common carrier for reward—that riders, having delivered themselves into the control of the operator, are owed the highest degree of care for their safety—simply does not apply to bumper car riders' safety from the risks inherent in bumping. "The rule that carriers of passengers are held to the highest degree of care is based on the recognition that '[t]o his diligence and fidelity are intrusted the lives and safety of large numbers of human beings.'" A bumper car rider, in contrast, does not entrust the operator with his or her safety from the risks of low-speed collisions.

*Nalwa*, 290 P.3d at 1166 (citations omitted). And more recently, the California Court of Appeals held that a hot air balloon was not a "carrier of persons for reward" under the Civil Code sections 2100 and 2168, because hot air balloon operators have minimal control over a hot air balloon and thereby the safety of its occupants. *Grotheer v. Escape Adventures, Inc.*, 222 Cal. Rptr. 3d 633,

641 (Cal. Ct. App. 2017). As the court remarked, "No amount of pilot skill can completely counterbalance a hot air balloon's limited steerability." *Id.* Thus, the court held that "ratcheting up the degree of care" was inapt. *Id.* These latter cases demonstrate that even under California's broad statutory definition, public carriage alone does not warrant common carrier status. Rather, "the key inquiry [under California law and for a control analysis] is whether passengers expect the transportation to be safe because the operator is reasonably capable of controlling the risk of injury." *Id.* at 640–41.

Applying the caselaw considered above, neither the nature of Alpine Adventures' occupation or its amount of control support a finding that Alpine Adventures is a common carrier. Even under California law, whitewater rafting is not a form of recreation that passengers can reasonably expect to be safe because the operator can control the risk of injury. As evidenced by Ms. Todd's untimely death here and by Alpine Adventures' Release of Liability Form, whitewater rafting involves significant risks that cannot be mitigated or controlled, and the dangers involved underscore that Alaska Alpine Adventures is not in the business of transportation.

## C.  Customer Discrimination & Passenger Status

In addition, Alpine Adventures does not operate for hire without discrimination, and Ms. Todd was not riding as a passenger in the inflatable canoe at the time of the accident.

While Alpine Adventures does not discriminate based on race or nationality, it is undisputed that Alpine Adventures has physical and mental requirements that its guests must meet, and it reserves the right to exclude potential customers based on their physical or emotional limitations. Alpine Adventures Release of Liability Form and Mr. Oberlatz's deposition testimony make this clear. Alpine Adventures Release of Liability Form, which Ms. Todd signed, requires participants to acknowledge that they:

> understand that AAA reserves the right to deny any person participation before or during a trip if it determines that person to be mentally or physically unprepared.

AAA reserves the right to require a person to leave at his expense, if it is determined that s/he is unfit to continue, or is a danger to himself/herself or others.

(Def.'s Mot. Ex. 5.) Likewise, Alpine Adventures' owner and founder, Mr. Oberlatz, confirmed that Alpine Adventures reserves the right to deny service based on mental or physical limitations during his deposition:

Q: In the fifth paragraph of the release, it reads, "I understand that AAA reserves the right to deny any person participating or participation before or during a trip if it determines that person to be mentally or physically unprepared." Did I read that correctly?

A: Yes.

Q: And is that a true statement?

A: It is a true statement.

Q: And what does it mean by "mentally or physically unprepared?"

A: Occasionally people show up on our trips and they are not prepared for the rigors of wilderness travel, either mentally prepared or physically prepared. And so, in situations like that, we reserve the right to ask them to leave the trip.

Q: And have you ever asked anyone to leave a trip or denied someone participation in a trip because of . . . other mental or physical unpreparedness?

A: Yes.

. . .

Q: So, then what would some examples of physical unpreparedness be?

A: A lack of physical fitness or a preexisting injury that was not disclosed and inability to move through the wilderness with the rest of the group.

(Pl.'s Mot. Ex. 1E.)

As courts have generally recognized, the placement of such limitations on participation is not consistent with a definition of common carrier that includes a requirement that carriage be without discrimination. *Deutsch*, 85 F.3d 640 (holding that a rafting company was not a common carrier, because it did not indiscriminately provide rafting trips to everyone who wanted to ride); *Chavez*, 450 S.W.3d at 299 (holding that an amusement park did not qualify as a common carrier,

because it did not "hold itself out to carry 'everyone who asks' but exercise[d] discretion by excluding those who [did] not meet the height requirement of 46 inches"); *Balloons Over the Rainbow, Inc. v. Dir. of Revenue*, 427 S.W.3d 815, 827 (Mo. 2014) (en banc) (holding that a hot air balloon operator was not a common carrier because it exercised discretion regarding which passengers to fly). Consequently, Alpine Adventures does not transport people or things for hire without discrimination.

Finally, it is beyond dispute that Ms. Todd was not riding as a passenger when the accident occurred. Rather, Ms. Todd was piloting the two-person inflatable canoe along with another traveler. Unlike a passenger in a common carrier who has no control over the operation of the conveyance in which he is riding, Ms. Todd and the other traveler in the canoe were the only people with the ability to control their canoe as they traversed the river. They were not merely passengers along for a ride, they were the crew. Accordingly, the Court cannot conclude that Ms. Todd was a passenger, in any normal sense of the word, when the accident occurred.

### D.  Waiver & Estoppel

The Plaintiff's further arguments about waiver and estoppel are inapplicable and are unsupported by fact or law. The denial letter sent to the Plaintiff on March 13, 2017 did not indicate that other provisions of the insurance policy were established. (Pl.'s Mot. Ex. 1H.) It only stated that the inflatable canoe was not registered and so it did not meet "the policy criteria of a Common Carrier." (*Id.*) The letter followed by listing the "pertinent provisions of the policy" in plain, ordinary type that included the definition of a cover hazard—"circumstances . . . occurring on a Covered Trip while the Insured Person is: riding as a passenger in . . . any Common Carrier"— and the definition of common carrier—"any licensed . . . conveyance operated by those whose occupation or business is the transportation of persons or things without discrimination and for hire." (*Id.*) Before closing, the final paragraph of the letter expressed that the analysis in the letter

was not exhaustive and the Defendant did not waive other provisions of the policy that may be applicable.

Despite the Plaintiff's characterization that a second letter confirmed that the sole reason for the denial of coverage was because the raft was not licensed, the letter sent on August 3, 2017 stated that "the inflatable two person canoe that Ms. Todd was in at the time of this loss was not a Common Carrier as is defined by this policy." (Pl.'s Mot. Ex. 1I.) The second letter likewise incorporated relevant policy provisions, including the definition of common carrier that the letter maintained was unmet. In the final paragraph, it reiterated that the coverage analysis was not meant to be exhaustive and that the Defendant did not waive any other provisions of the policy that may be applicable. Thus, the facts do not support the Plaintiff's waiver or estoppel arguments.

Furthermore, caselaw does not support the proposition that the Defendant waived its right or is estopped from raising the arguments addressed herein. *E.g.*, *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 636 (Cal. 1995) ("California courts have applied the general rule that waiver requires the insurer to intentionally relinquish its right to deny coverage and that a denial of coverage on one ground does not, absent clear and convincing evidence to suggest otherwise, impliedly waive grounds not stated in the denial. Of the 33 sister states to consider the issue, 32 agree with the California rule."); *see In re Harrison Living Tr.*, 112 P.3d 1058, 1062 (Nev. 2005) ("(1) the party to be estopped must be apprised of the true facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has the right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; (4) he must have relied to his detriment on the conduct of the party to be estopped"); *see also Prime Ins. Syndicate, Inc. v. Damaso*, 471 F. Supp. 2d 1087, 1098 (D. Nev. 2007) ("In the insurance context, however, 'there is a well established doctrine that waiver and/or estoppel cannot be used to extend the coverage or the scope of the policy.' This doctrine reflects the majority rule." (quoting *Walker v.*

*Am. Ice Co.*, 254 F. Supp. 736, 741 (D.D.C. 1966)).

**E. Disposition**

In sum, the decedent was not a passenger in a common carrier or a passenger in an entity operated by a common carrier when she died. Therefore, the Court finds that summary judgment is appropriate for the Defendant concerning the Plaintiff's breach of contract claim. As a consequence, the Plaintiff's remaining claims for bad faith, breaches of Nevada's Unfair Claims Practice Act, and punitive damages for malice, fraud or oppression, fail as a matter of law, and summary judgment is also appropriate for the Defendant on those claims.

**CONCLUSION**

IT IS HEREBY ORDERED that the Defendant's Motion for Summary Judgement (ECF No. 27) is GRANTED.

IT IS FURTHER ORDERED that the Plaintiff's Motion for Summary Judgment (ECF No. 28) is DENIED.

IT IS SO ORDERED.

Dated this 8th day of August, 2019.

_____
ROBERT C. JONES
United States District Judge